## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

HOLLY MCLEAN,

                Plaintiff,

v.

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

                Defendant.

CASE NO: _____

**EMERGENCY INJUNCTIVE
RELIEF REQUESTED**

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

Plaintiff Holly McLean ("McLean") brings this action to challenge the application of Bylaw 14.5.5.2 of the National Collegiate Athletic Association ("NCAA") which deprives Plaintiff of her eligibility to compete in collegiate athletics at the University of South Florida ("USF"). Bylaw 14.5.5.2 relates to the eligibility of college athletes who transfer from one NCAA Division I institution to another in the same academic year. This action seeks declaratory and injunctive relief against Defendant, in addition to other remedies.

### PARTIES

1.      McLean is a college athlete competing in the sport of women's golf. She is currently enrolled at USF and resides in Tampa, Hillsborough County, Florida.

2.    USF is a public research university with its main campus located in Tampa, Hillsborough County, Florida.   USF is a member of the State University System of Florida.

3.    USF sponsors eight men's athletics teams and eleven women's athletics teams that compete at the NCAA Division I level, including its women's golf team. With the exception of the non-NCAA sponsored sport of women's sailing, all of USF's athletics teams compete within the American Athletic Conference ("AAC"), which is commonly known as a "Group of 5 Conference."

4.    Defendant NCAA is an unincorporated nonprofit association that acts as the governing body of college sports. The NCAA's membership includes more than 1,100 member colleges and universities throughout the United States, including the University of Oklahoma ("OU"), McLean's former institution, and USF. Member institutions are organized into three divisions based on size, athletic play, academics, and number of scholarships and aid offered. Division I is the largest and most competitive tier of collegiate athletics. It includes approximately 350 schools.

5.    Academic institutions that wish to participate in NCAA Division I collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations.

6.    These rules are exhibited in the NCAA Constitution and Bylaws. The rules govern all aspects of college sports, including specifically, the bylaw

at issue in this case, Bylaw 14.5.5.2. The 2024-25 NCAA Constitution and Bylaws are attached hereto as **Exhibit A**.

7.      The NCAA Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the same. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions.

8.      Any individual who wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must attend an NCAA Division I member institution.

9.      There are no alternatives to the unique combination of attributes offered by Division I NCAA athletics including academic services, training facilities, coaches, elite competition, exposure and publicity through nationwide broadcasts and competitions, and opportunities to profit from name, image and likeness ("NIL") agreements and the opportunity for significant revenue sharing.

10.     If McLean is not granted immediate eligibility, she will miss the entire 2025 spring season of college golf, the only segment of the season which culminates in a NCAA championship, which will immediately impact her individual rankings.

11.     By missing the 2025 spring season, McLean will suffer irreparable harm to her athletic development, academic progress, NIL opportunities, and potential professional career.

12.     McLean seeks an order enjoining the NCAA from enforcing Bylaw 14.5.5.2 against her.

## JURISDICTION AND VENUE

13.     These claims are brought pursuant to the Sherman Act, 15 U.S.C. § 1.

14.     This Court has subject-matter jurisdiction over the federal claim – a violation of the Sherman Act – asserted pursuant to 28 U.S.C. §1331.

15.     This Court may exercise specific personal jurisdiction over Defendant NCAA in Hillsborough County, Florida based on its contacts with Florida and related to its activities in Florida through its guidelines and bylaws for college sports purposefully directed at Florida. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other significant revenue-generating activities in Hillsborough County, Florida.

16.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2).

## FACTUAL BACKGROUND

17.     McLean initially enrolled during the 2023-2024 academic year at OU, a NCAA Division I institution and member of one of the "Power Five" conferences, to play college golf.

18.    McLean competed for OU during the 2023-2024 season and finished in the top 50 at the Big 12 Conference Championship. She also maintained academic good standing while competing for OU.

19.    During the fall 2024 semester, McLean played as an individual in one non-championship segment competition, the OU Schooner Fall Classic, on September 21-23, 2024. Her results from the OU Schooner Fall Classic did not count toward OU's team score at the competition, nor toward any NCAA championship-related postseason play for OU. She did not participate in any other contests for OU in the fall 2024 semester.

20.    On November 20, 2024, a matter of days before the fall window for NCAA Division I transfers, the OU coaching staff notified McLean and several other players that their scholarships would not be renewed.

21.    The OU coaching staff explained to McLean that the decision to cut her from the team was based solely on the anticipation of new roster size constraints and budgetary adjustments following the implementation of the *House v. NCAA* settlement, which resolved a class-action lawsuit between the NCAA, the "Power Five" athletic conferences, and athletes over NIL and revenue sharing damages. *House v. NCAA*, 545 F. Supp. 3d 804 (N.D. Cal. 2021).

22.    Notably, the AAC, of which USF is a member, is not a "Power Five" conference.  Upon information and belief, the AAC was not involved in, nor had any say in, the settlement discussions of *House.*

23.     The *House* settlement, which has been preliminarily approved by Judge Claudia A. Wilken in the United States District Court for the Northern District of California, requires the NCAA to overhaul its rules governing roster sizes and scholarship allotments for all Division I sports, and is anticipated being effective this year. *See House*, Doc. 554 Order Granting Plaintiff's Motion for Preliminary Settlement Approval, attached hereto as **Exhibit B**. Under the new rules, opt-in schools, which includes OU due to its association with the "Power Five" Southeastern Conference, would have a maximum roster size of nine for the sport of women's golf.

24.     In anticipation of the *House* settlement many Division I athletic programs are evaluating the option to reduce their current roster sizes and scholarship offerings to accommodate new market realities.

25.     McLean had no prior intention, desire, or reason to transfer from OU, where she was happy and successful both academically and athletically. *See* Declaration of Holly McLean, attached as **Exhibit C**.

26.     McLean was devastated by the news of her dismissal from the OU team. She felt betrayed, abandoned, and uncertain about her future. She had to quickly decide whether to stay at OU without a scholarship and without playing golf, or to look for another Division I school that would accept her as a transfer and offer her a scholarship and a spot on the team. *Id.*

27.     OU's timing of the decision was intended to give McLean an opportunity to transfer and find a new institutional home prior to other athletes

flooding the NCAA transfer portal.  *See* OU Letter of Support, attached as **Exhibit D**.

28.    McLean did not want to give up on her dreams of playing college golf at the highest level and pursuing a professional career. She also did not want to incur significant debt by paying for her education at OU without a scholarship. Thus, she decided to pursue other opportunities through the NCAA's transfer portal.  *See* **Exhibit C**.

29.    In January 2025, McLean enrolled at USF, which offered her a scholarship and a place on the women's golf team.

30.    At the time of her transfer, McLean was eligible for competition at OU and otherwise met all requirements to transfer and compete for USF. *See* Declaration of USF Senior Associate Athletic Director for Complaince Brendan Armitage, attached as **Exhibit E**.

31.    On or around January 25, 2025, USF submitted a request to the NCAA for a legislative relief waiver on McLean's behalf, seeking a determination that Bylaw 14.5.5.2 ("Competition in the Year of Transfer Rule") was not applicable due to her unforeseen circumstances. USF sought her immediate eligibility to compete at USF. *See* NCAA Requests/Self-Reports Online Legislative Relief Waiver, attached as **Exhibit F**.

32.    A legislative relief waiver is a mechanism for exempting an individual or institution from the application of a specific NCAA regulation

based on evidence of compliance with the specified conditions or criteria under which the waiver is authorized or extenuating circumstances.

33.    The Competition in Year of Transfer Rule  states that "a transfer student from a four-year institution who satisfies the applicable four-year college transfer requirements shall not be eligible for competition in which the student-athlete's performance could be used for NCAA championship qualification or consideration if the student-athlete participated in competition at the previous four-year institution in the same sport in which the student-athlete's performance could have been used for NCAA championship qualification or consideration."[1]

34.    On January 30, 2025, the NCAA denied this waiver, effectively ruling McLean ineligible for the 2025 spring season on the basis that she participated as an individual for OU in the OU Schooner Fall Classic during the prior semester, triggering the application of the Competition in Year of Transfer Rule, even though her participation was in the non-championship segment competition had no bearing on OU's NCAA championship qualification or consideration.

35.    McLean was unaware of the potential impact of the Competition in Year of Transfer Rule on her eligibility when she played in the OU Schooner Fall Classic because she had no reason to anticipate that she would be cut from the OU team or that she would need to transfer to another school.  Further, prior

---

[1]    Bylaw 14.5.5.2, *See* **Exhibit A**, pp. 164.

to registering her as an individual in the OU Schooner Fall Classic, OU never advised her of the potential of being cut from the team or the impact of her competing if she were cut.

36.    On or around February 3, 2025, USF submitted a letter for reconsideration to the NCAA, clarifying the facts and circumstances of her case and emphasizing that her situation was unique and not comparable to any prior case precedent. *See* USF Request for Reconsideration for Immediate Eligibility – Holly McLean, attached hereto as **Exhibit G**.

37.    On February 12, 2025, the NCAA again denied USF's request for a legislative relief waiver, stating that "the circumstances do not warrant relief of the legislation and "the facts presented do not warrant relief of the legislation." *See* February 12, 2025 NCAA Denial, attached hereto as **Exhibit H**.

38.    As a result of the NCAA's denial of the legislative relief waiver, McLean remains ineligible to compete for USF in the spring 2025 season, resulting in a lost year of opportunity and detriment to her personal rankings. McLean has exhausted all potential avenues for relief with the NCAA.

39.    McLean has been, is being, and will continue to be irreparably harmed by the NCAA's enforcement of the Competition in Year of Transfer Rule as it deprives her of the opportunity to play college golf at the highest level, to develop her athletic skills and potential, to earn NIL compensation and revenue sharing, to pursue a professional career, and to enjoy the full benefits of being a Division I athlete.

## COUNT I: *PER SE* VIOLATION OF
## § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

40.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-39 of this Complaint.

41.    The Competition in Year of Transfer Rule affects the market for Division I athletes. Within this relevant market, college athletes, like McLean, compete for roster spots on Division I teams and those NCAA Division I institutions compete against each other to recruit the best athletes to compete on their athletic teams. NCAA has a dominant position in the relevant market.

42.    The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

43.    The NCAA's contracts, combinations, and relationships consist of a continuing agreement, understanding, and concert of action among the NCAA and its members, vendors, and customers, the substantial terms of which are to artificially fix, decrease, maintain, and/or restrict the amount of college athletic services in the United States.

44.    Alternately, the NCAA's contracts, combinations, and relationships consist of a continuing agreement, understanding, and concert of action among the NCAA and its members, vendors, and customers, the substantial terms of which are to artificially fix, depress, maintain, and/or

stabilize prices paid for collegiate athletic services in the United States, its territories and possessions.

45.    The NCAA's actions have unreasonably restrained competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

46.    Said actions include, but are not limited to, preventing college athletes who transfer from one Division I institution to another in the same academic year, due to no fault of their own and due only to the NCAA's decision to resolve *House v. NCAA* in a manner that disproportionately effects athletes like McLean, from competing in the same sport in which they participated at their previous institution, thereby limiting the athlete's academic, athletic, and economic opportunities to participate in the marketplace of college athletics, and otherwise unreasonably restraining competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

47.    Further, the NCAA's offending actions include, but are not limited to, improperly applying its rules and regulations in the denial of McLean's legislative relief waiver in an arbitrary and capricious manner.

48.    The NCAA's conduct impacts interstate commerce.

49.    The NCAA's actions have produced and, unless restrained, will continue to produce, the following anti-competitive impact, among others:

        a. Artificially restrain and depress the number of transfer athletes that participate in college athletics;

b. Deprive athletes, such as McLean, of the benefits of Division I competition; and

c. Artificially restrain and depress the ability of athletes to benefit and profit from their NIL at the highest level.

50.    As a direct and proximate result of the NCAA's actions, Plaintiff has been, is being, and will continue to be, irreparably injured.

51.    The NCAA's abridgment of the economic rights of McLean and similarly situated athletes is a naked, *per se* restraint of trade. Similarly, the impact of the NCAA's improper determination of eligibility is an abridgement of the economic rights of the other athletes on USF's women's golf team as well as the team's overall ability to compete.

52.    McLean is entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

53.    McLean is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent McLean from playing golf at USF in the spring 2025 season.

54.    McLean is entitled to a permanent injunction that enjoins defendant from engaging in the ongoing violations described in this Complaint.

## COUNT II: UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

55.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-54 of this Complaint.

56.    As an alternative to Count I, if the Court determines that the NCAA's conduct does not constitute, in whole or in part, a *per se* antitrust violation, Plaintiff alternatively pleads that the NCAA's conduct when analyzed, in whole or in part, via the "quick look" analysis, or via the full "rule of reason" antitrust analysis, violates the Sherman Act.

57.    At all relevant times and continuing through the resolution of this case, the NCAA has engaged and continues to engage in contracts, combinations and conspiracies that preclude college athletes who transfer from one Division I institution to another in the same academic year due to no fault of their own and due only to the NCAA's decision to resolve *House v. NCAA* in a manner that disproportionately effects athletes like McLean, from competing in the same sport in which they participated at their previous institution, and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

58.    The anti-competitive effects of the NCAA's scheme substantially outweigh any alleged pro-competitive effects or justifications that may be offered by Defendant.

59.    Reasonable and less restrictive alternatives are available to the NCAA's current anti-competitive practices including, but not limited to,

allowing all athletes the same opportunity to transfer and compete in Division I athletics without losing their eligibility, so as to not unreasonably restrict their access to a competitive athletic career, academic education, NIL, and other benefits available to Division I participants.

60.    Rational, consistent, and unbiased application of its own rules, regulations, and bylaws would allow for a more reasonable and less restrictive alternative to the NCAA's current anti-competitive practices.

61.    McLean is entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

62.    Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent McLean from playing golf at USF in the spring 2025 season.

63.    Plaintiff is entitled to a permanent injunction that enjoins the NCAA from engaging in the ongoing violations described in this Complaint.

## COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT WITH SCHOOL

64.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-63 of this Complaint.

65.    McLean has a contractual relationship with USF.

66.    As part of that relationship, McLean is entitled and expected to participate on USF's women's golf team.

67.    The NCAA was aware of this relationship.

68.    The NCAA has interfered with the relationship between McLean and USF.

69.    The NCAA's interference includes, but is not limited to, refusing to grant McLean a legislative relief waiver when she is entitled to one, acting arbitrarily or capriciously with regard to McLean and her eligibility, ignoring her rights, and violating the NCAA's own rules and guidelines.

70.    The NCAA had a duty not to tortiously or needlessly interfere in the relationship between USF and McLean and especially had a duty not to refuse to follow its own bylaws and to not act arbitrarily or capriciously with regard to her.

71.    The NCAA's interference with the relationship between USF and McLean has harmed and will continue to harm McLean.

72.    Plaintiff is entitled to damages for the NCAA's interference.

## <u>COUNT IV: PROMISSORY ESTOPPEL</u>

73.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-72 of this Complaint.

74.    By promulgating rules, regulations, bylaws, and guidelines the NCAA makes certain promises to college athletes.

75.    By continually espousing that its main goal is a commitment to athlete welfare, the NCAA makes certain promises to college athletes.

76.    By granting waivers from its rules and regulations, the NCAA makes certain promises to college athletes.

77.    Those promises include, but are not limited to, the promise to apply its rules, regulations, bylaws, and guidelines uniformly and fairly in a non-arbitrary and non-capricious manner and not make arbitrary and capricious decisions when it came to college student athletes' welfare.

78.    The NCAA has a duty to genuinely consider and take into special account extenuating circumstances where adherence to NCAA rules and regulations would harm college student athletes' welfare.

79.    College athletes, including McLean, rely upon these promises. Member institutions, such as USF, also rely on these promises.

80.    The NCAA foresaw, or should have foreseen, that college athletes, such as McLean, and member institutions, such as USF, would rely upon those promises.

81.    McLean reasonably relied upon those promises when making decisions regarding attending college and, in her case, transferring institutions.

82.    USF reasonably relied upon these promises in offering and providing McLean a scholarship to attend USF as a athlete.

83.    Plaintiff reasonably relied upon those promises to her detriment.

84.    Plaintiff has been damaged and will continue to be damaged by their reasonable reliance upon the NCAA's promises.

## COUNT V: ARBITRARY ENFORCEMENT OF RULES, REGULATIONS, AND/OR BYLAWS

85.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-84 of this Complaint.

86.    The NCAA was formed by a collection of agreements and contracts between its members.

87.    As part of those agreements, the NCAA agreed – either implicitly or explicitly – that it would make its decisions and enforce its rules in compliance with its constitution and bylaw and do so in a non-arbitrary, non-capricious manner.

88.    McLean is a third-party beneficiary of those agreements.

89.    McLean is directly affected by the NCAA's decisions and enforcement of its rules, and regulations.

90.    The terms of the *House* settlement were determined by a small subset of the most powerful conferences – and by extension their members – without input from institutions such as USF.  The terms of *House* have altered the administrative landscape within the NCAA in ways outside of USF's consent.

91.    Under both the original framework and *House*, the NCAA has a duty and obligation to Plaintiff to make decisions and enforce NCAA rules in compliance with NCAA stated regulations and rules and to do so in a non-arbitrary, non-capricious, and non-selective manner.

92.    NCAA Bylaws include mechanisms for waiving or exempting an individual or institution from the application of a specific regulation.

93.    Specifically, NCAA Bylaw 14.02.14 states that "[a] A waiver is an action exempting an individual or institution from the application of a specific regulation. A waiver requires formal approval (e.g., an NCAA committee or a conference, as specified in the legislation) based on evidence of compliance with the specified conditions or criteria under which the waiver is authorized or extenuating circumstances."

94.    McLean met the necessary qualifications and applied for a waiver, providing the required documentation, asserting facts and circumstances in accordance with the NCAA guidelines.

95.    However, the NCAA has issued two formal decisions denying McLean's request for a legislative waiver for her immediate eligibility.

96.    The NCAA has arbitrarily, capriciously, and selectively created a basis for denial against McLean.

97.    McLean has been irreparably damaged by this arbitrary, capricious, and selective enforcement.

98.    Plaintiff is currently, and will continue to be, injured by the NCAA's actions.

99.    Pursuant to Fed. R. Civ. P. 57, this Court has the power to "… declare rights, status, and other legal relations whether or not further relief is or could be claimed."

100.    Plaintiff is entitled to a declaratory judgment declaring as void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent McLean from immediate being eligibility to play golf at USF in the spring 2025 season.

101.    Plaintiff is entitled to a permanent injunction that enjoins the NCAA from engaging in the ongoing violations described in this Count.

## COUNT VI: DECLARATORY JUDGMENT

102.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-101 of this Complaint.

103.    Pursuant to Fed. R. Civ. P. 57, this Court has the power to "…declare rights, status, and other legal relations whether or not further relief is or could be claimed."

104.    For the reasons stated above, Plaintiff asks this Court to judge, hold, and declare that McLean has a right to compete on behalf of USF's women's golf team in the spring 2025 season, regardless of her prior participation in a single non-championship event that did not count towards OU's qualification for NCAA post-season play.

105.    Plaintiff asks this Court to judge, hold, and declare that McLean has a right to be treated fairly by the NCAA and a right to rational, fair, and equitable decisions by the NCAA when applying its rules, regulations, bylaws, and guidelines to her.

## COUNT VII: RESTRAINING ORDER AND INJUNCTIVE RELIEF

106.    Plaintiff incorporates by reference every allegation contained in paragraphs 1-105 of this Complaint.

107.    The harm McLean faces as a result of the NCAA's conduct set forth above is irreparable.

108.    No amount of monetary damages can mitigate or undo the harm that comes from being improperly withheld from college athletic contests. Improperly withholding her results in lost opportunities that can never be regained.  Thus, the NCAA has irreparably harmed Plaintiff.

109.    For these reasons, Plaintiff seeks an injunction from this Court enjoining the NCAA from enforcing its rules, regulations, and bylaws that prevent Plaintiff from having immediate eligibility to play golf for USF in the spring 2025 season.

110.    Should the Court grant injunctive relief, it must also address NCAA Bylaw 12.11.4.2, the "Rule of Restitution."[2] The Rule of Restitution provides: "If a student-athlete who is ineligible under the terms of the bylaws . . . is permitted to participate in intercollegiate competition contrary to such NCAA legislation, but in accordance with the terms of a court restraining order or injunction . . . and said injunction is voluntarily vacated, stayed, or reversed, or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following

---

[2] Bylaw 12.11.4.2, *See* **Exhibit A**, pp. 65.

actions against such institution in the interest of restitution and fairness." In other words, the NCAA threatens to punish its members for following a court's orders.

111. Potential actions by the NCAA under the Rule of Restitution include vacating wins, striking individual records and performances, postseason bans, remittance of television revenue sharing, and financial penalties, among others.

112. Therefore, to ensure any injunctive relief in this case is meaningful, Plaintiff respectfully requests that the Court also enjoin any application of the Rule of Restitution against McLean, USF, and any other NCAA Division I institution to which McLean could transfer in the future.

**WHEREFORE**, Plaintiff respectfully requests:

(1) An emergency order enjoining the NCAA from enforcing its Competition in the Year of Transfer Rule that prevents McLean from having immediate eligibility to play golf for USF in the spring 2025 season as well as the NCAA's Rule of Restitution should the emergency order be later reversed;

(2) An award of all damages due to Plaintiff as a result of the NCAA's conduct;

(3) An award of treble damages to McLean pursuant to 15 U.S.C. § 15;

(4) An award of Plaintiff's attorneys' fees, costs and expenses; and

(5) Any other relief that the Court may deem just and equitable.

Dated this 20th day of February, 2025.

/s/ Jacob Salow
**One of the Attorneys for
Plaintiff Holly McLean**

**OF COUNSEL**:

William H. Brooks *(motion for admittance pro hac vice forthcoming)*
*wbrooks@lightfootlaw.com*
Clinton T. Speegle *(motion for admittance pro hac vice forthcoming)*
*cspeegle@lightfootlaw.com*
Jacob Salow (Florida Bar No. 1019760)
*jsalow@lightfootlaw.com*
Kayla R. Williams *(motion for admittance pro hac vice forthcoming)*
*kwilliams@lightfootlaw.com*
**LIGHTFOOT, FRANKLIN & WHITE, L.L.C.**
400 NORTH 20TH STREET
BIRMINGHAM, AL 35203-3200
(205) 581-0700
***Counsel for Plaintiff Holly McLean***

**DEFENDANT TO BE SERVED**:

National Collegiate Athletic Association
c/o Scott Bearby
Senior Vice President of Legal Affairs and General Counsel
700 W. Washington Street
P.O. Box 6222
Indianapolis, Indiana 46206-6222